and 14-1-1-2-7 United States v. Ronald J. Martinez. Thank you. Go ahead, Counsel. Good morning, Your Honors. Amy Belger for Mr. Dzhanikyan. My client suffered extreme prejudice by being tried with his co-defendant, Ronald Martinez, in this case. They should have had separate trials, and as a result of the prejudice he suffered, he should get a new trial. In this case, there was no... Let me make certain I understand procedurally what happened here. Sure. At the time that your client moved to sever, there were several other defendants in the case? At the time, my client, it was the co-defendant's motion to sever right before the trial began. Right. Earlier on, it started out, I believe, with 17 defendants, then 14, and descending down with every adjournment. So did your client file a motion to sever at any time? No, Your Honor. Okay. So we're on plain error review. Yes, we are. We're on plain error review. And I'd say it meets the plain error standard in this case, because there was absolutely no connection whatsoever between my client and the co-defendant at trial. And if you look at the evidence that was presented at that trial as to each, my client was alleged to have been involved in one transaction to supply Percocet pills to another, and that's it. And the trial evidence basically was about 45 minutes of testimony about my client and seven days of testimony about the co-defendant, where the jury heard about, you know, a shootout at a jewelry store in the middle of the day where civilians were shot and injured, somebody breaking into a house in the middle of the night. Excuse me. Let me pursue my original thought. Are you aware of any case in this circuit or any other circuit where, in the absence of a motion to sever, an appellate court following a guilty verdict has applied plain error review and ordered a new trial? I would say, Your Honor, the answer is no. Okay. But I would say in this case. Excuse me. Isn't the reason for that? Because think of the paradigm that you're setting up, all right? Here's a defendant who faced with what you now say is an obvious misjoinder. The facts that you're telling us about now were evident prior to trial, indeed evident from a reading of the indictment. So a defendant faced with an obvious argument for joinder elects to keep silent, take his chances with the jury, and when the verdict turns sour, then attempts to obtain the relief by way of severance. It would seem to me that courts would be very hostile to that sort of tactic. Well, Your Honor, it wasn't like the trial judge wasn't on notice of the issue. The co-defendant brought the issue to the court. The trial judge wasn't on notice that your client had any problem with the joinder. I understand, except that with respect to the way this case went in and this case was prosecuted and how it unfolded, this was a very complex case. What was so complex about it? By the time you get to trial, there are two defendants and how many, what, about five counts? Is that right, going in? I believe so, yes. Pretty, I mean, not to minimize their significance, but these are pretty common type charges. So what was so complex about all this? It was complex because the way that the organization, if you will, the criminal enterprise, was layered in the case. There was a connecting figure between my client and the co-defendant, but the conspiracies with which they were alleged to have participated with that common figurehead were completely separate and apart. And in addition to the fact that on its face there are two separate conspiracies, the two defendants have nothing to do with each other, the jury asked how they were supposed to consider this evidence in deliberating on the guilt or innocence of both. And the judge told them to consider all the evidence that they heard as to each defendant in terms of guilt. Could you just go back to why we should treat this as forfeited and thus subject to plaintiff rather than waived? Because, Your Honor, I believe that to show good cause as to why it wasn't raised, I would say, again, it was a very complicated, complex case that was multilayered in terms of the conspiracies. It's a very difficult thing to follow. And it's only when really the case goes in in its entirety at trial that it becomes apparent, okay, as to the prejudice and why really they should have been severed from the outset. So the idea is it wasn't apparent at the beginning that they were, as you put it, wildly disparate criminal offenses that they were being charged with? I would say to you not, because at the beginning you have Matarati as the figurehead in the conspiracy that brings them both before the court. But as the evidence unfolds, and it takes, you know, seven days of testimony about all the players involved in this organization, and, you know, it's at that point when you see that. And the jury had a legitimate question as well. Excuse me, at that point you see that and you move for a mistrial, right? At that point. Yeah, during the trial you've seen now that it's wildly disparate. So you want to alert the district court to this terrible injustice. I would say to you that the district court was alerted, Your Honor. Excuse me. So what motion did you file to alert the district? There was not a motion filed. So I would say I would ask you to consider the claim as forfeited as opposed to waived, as there is good cause to do so in light of the particular facts of this case. And also considering. Just to be precise, even at that point in the trial? I understand your argument. Right. Pre-trial it was complex. We wouldn't know that they were so different. By the time we're pretty deep into the trial, you would know. So why wouldn't we treat any claim done as waived? I'd say in this particular case on these facts, given the nature of the facts and the prejudice my client suffered and the jury instruction objection was preserved. And that was an egregious error. On the jury instruction issue, I realize that there's something different about a judge's response to a particular question from the jury. But the judge was careful throughout in the instructions to talk about the importance of the jurors focusing on the evidence that applied to the particular charges involving the particular defendants. And I thought even here, despite the language that you find problematic, there was a clarification where the judge repeated the importance that they focus on the evidence as it relates to the particular defendants and the particular charge that they're facing. Isn't that true? I believe that the jury's question went precisely to this issue. And the question was, can we consider all the evidence in the case as to each defendant? And the judge's answer to the question was yes. So I think that in light of that and the plain question and the plain answer, all of the general jury instruction language that they get, that doesn't cure the error there in the minds of laypeople. With respect to the statement that you cited, there was no subsequent clarification by the judge emphasizing that the jury should focus on the evidence that relates to the particular defendants and the particular charges they're facing? There was no such clarification? That language was said, but I would say that it was confusing as to the jury. The jury was confused as to how to consider the evidence. They wouldn't have asked the question if they weren't. And the direct answer she gave them was contrary to law. Thank you. May it please the Court. My name is Doreji Demise. I represent the appellant, Ronald Martinez. We're asking the Court to reverse the judgment below on three grounds. Would you mind just pulling the mic just a little closer to your? Sure. Thank you. We're asking the Court to reverse the judgment below on three grounds, specifically the variance that was created by the jury instruction that was given in response to the jury question on the second day of deliberation, the retroactive disjoinder that occurred after the judge vacated or entered a required finding, directed verdict on account of extortion, and also the lack of evidence relative to the extension of credit element to the extortion charge that remained. May I ask you to start with what you call the retroactive misjoinder? Sure. So your theory, as I understand it, is that once the judge ordered judgment acquittal on count two and eliminated that from the case, that created the misjoinder because the jury had now heard all of the damaging evidence that came in only on that count and was bound to color its consideration of the remaining count, count three. Correct. All right. So didn't you have an obligation on this theory, once that judgment acquittal came down, if you thought that this had created a retroactive misjoinder, and assuming that there is such a thing as a retroactive misjoinder, assuming that had been created, didn't you have an obligation in order to preserve this claim to move at that point from this trial? I don't believe so, Your Honor. You had all the facts that were necessary to put this claim in perspective. You knew count two had been thrown out of the case. You knew all the evidence on count two had been heard by the jury. You knew as well as you know now that that evidence might color the jury's consideration of count three, so you had all the notice that you would ever have of the harm. The only fact that you didn't know was that the jury would find your client guilty. Other than that, you knew everything. There are two – I'll respond in two ways to that. Number one, the motion was for judgment of acquittal on all charges. I know. I think that sort of raises the issue for the court. No, because you get a ruling on that motion, and I'm focusing on once you get the ruling, don't you have an obligation to do something? Because saying your client deserves acquittal on count three is not the same thing as saying he's been denied a fair trial on count three. I understand. It probably did not raise the issue fully to the court, but what I'm arguing is the motion for judgment of acquittal on all charges sort of raises the requirement the defendant raises the issue of dismissal of all charges. That's true, but it doesn't cover the requirement that the defendant raises the issue of joinder. I would say, Your Honor, that issue was raised. I was going to come to my second point. When the jury asked the question, can we consider all of the evidence, the defense counsel raised the issue that allowing the other evidence that pertains to the dismissed charge or the charge that was vacated would create substantial harm to the defendant. And that objection was lodged, and I would argue that that objection raises the question that the 2-2 may not be as clearly stated by Your Honor. However, it raises the question that the dismissal of the charge now colors the evidence in a way that taints the evidence pertaining to the other remaining charges in a way that would deny the defendant a fair trial. And that prejudice was exasperated by the judge's response to the jury that they can consider all of the evidence. That's very helpful. Thank you. Can I ask you about the extension of credit and why you think Hoyle doesn't just govern here? The extension of credit issue, first of all, this statute, as stated by many courts, is a statute that was designed to combat loan sharking. It's not a statute that's designed to cover every scenario. But just on Hoyle, Hoyle's not a loan sharking case.  Government and the district courts seem to think under Hoyle there's an extension of credit here, too, and I just want to get what do you see as the distinction between your case and Hoyle? This is a clear theft case. This is a case where someone stole money from whether or be it from an illegal transaction, and a person trying to either send a message or frame the person. It wasn't really a direct attempt to collect the debt. It was an attempt to punish. And it's a distinctly different set of fact, distinctly different set of scenario. There was no extension of credit by any means. The government argues that by sending the person to California to collect the drugs, that somehow is a deferment of payment. That really doesn't make sense. And the reason that's different than Hoyle is because why? In Hoyle they didn't provide the bill for the electrical services right away, whereas? Again, theft is different from a scenario where a payment is expected. This was not a scenario where a payment was expected from Mr. Lucas. Well, I guess that's what I'm trying to figure out. He was supposed to deliver the drugs. I understand that, but then he comes back from California. Yes. And presumably he expects he's going to get something back at that point. Madarati does, right? Madarati expects the delivery of the pills. Okay, and when that doesn't happen? When that doesn't happen, he tries to punish him. Well, first he says, where are they? The guy says they were taken. Madarati apparently doesn't believe him. Yes. And why in the follow-on period between those exchanges where the drugs, well, they were taken, all the way until April 9th when the assault occurs? Why isn't that a time period, in your view, that counts as a deferral of the payment? Because, first of all, there was no arrangement for, I think the case that I cited, which is the second circuit case, covers the scenario, I believe it's the Hamilton case, which basically says that in that case the defendant was trying to get money from an individual who cashed a bad check and refused to give the money to split the proceeds. And the court said that is not an extension of credit. I think that's similar to this sort of situation. There was no expectation that Lucas would do anything with the drugs. He's only supposed to deliver them. And that doesn't really match a situation where someone is taking money to do something with it and pay it back. Thank you. Good morning, Your Honors, and may it please the Court. Kelly Lawrence for the United States. I'll start with the extension of credit issue that the Court was just discussing with Defense Counsel. First of all, this Court in Hoyle rejected the second circuits and the fifth circuits were a more stringent standard for defining what an extension of credit means. But on the other hand, we didn't accept the third circuits. We said you had to have, we left open the idea there's got to be some manifestation implicitly of an agreement to defer payment. And so where is that manifest here? I don't, I'm having trouble seeing it. In this case, there was evidence of a tacit agreement. And it doesn't need to be a bilateral agreement. I think the cases are clear and the circuits are consistent on that, by moderati, not to collect the debt immediately, or claim rather. And the statute defines it. Just walk me through the facts that would lead one to conclude there was such a tacit agreement. So the government doesn't contend that the deferral occurred at the time that Lucas took off to California with the money. But that does establish a claim because based on their past dealings, Lucas took moderati's money and he was supposed to deliver the pills, as he had done two times prior. When he didn't deliver the pills, he returned home to Boston, told moderati I don't have them. They were stolen, or seized by the police. That gave rise to a claim by moderati for that money or the pills. From that point forward, which I believe it was March 29th or 30th when they had the first conversation, moderati indicated in a conversation with Lucas, look, I hope you're telling the truth, because otherwise I'm going to take care of it like I did the drugs. So how is that an agreement to defer payment? Well, it continues further. So that's not an agreement to defer payment? It's evidence that he is letting Lucas have time to come up with the cash, which they both know were the pills. Well, then that would be, I just want to know, at that moment in that conversation, is that an agreement to defer payment? The government admits that, yes, that is one piece of evidence that moderati does not intend to collect immediately. Well, I know he doesn't intend to collect immediately. We know that because he doesn't collect immediately. But that's different than saying they agreed to defer payment. Moderati's agreement, it doesn't have to be an agreement with Lucas. I understand. It doesn't even show. What about that? I want something. I demand it. I say, the other person says, I don't have it. I say, well, I hope you find it. Have I deferred payment? He's manifesting an intent to wait to use other means to collect the money. He said, I'd like the money back. It's what you owe me. But then he continues to say, you owe me. Can I just, on that point, where I guess I'm losing you, is if I say I've lost the drugs, okay, and then the other party says, I hope you find them, one way to read that is, if you don't, you're off scot-free. What in that exchange indicates that if you don't find them, you're still going to be in trouble? Because he says expressly, I will take care of it like I did the jewelry store. That's after he's now said, I don't believe you. No, that's the first conversation. Is that that first exchange? When they drive to the, I believe it was a convenience store, 7-Eleven. That's if you're lying. I hope you're telling the truth, or I will do this. I will take care of it this way. Right, but that suggests not that he's deferring payment, but that if you've lost them, okay. If you're lying to me, we've got a different situation. There are other pieces of evidence, and I'll go into those. The government submits that that is the first indication that Matarati wants to defer payment because he cares more about getting the money or pills back than he does harming Lucas, and that's evident in his conversations with Mo Cava during the ensuing nine days before the attempted break-in by Martinez takes place. And during those conversations, Mo Cava and Matarati talk about what they're going to do to get the pills or the money back from Lucas, and Matarati says to Cava, or Cava says to Matarati, I don't think we should plant the cocaine because then you're going to set him up. He's going to go to jail and we'll never get your papers back. And Matarati says, yeah, maybe we should just have your boys sit tight. Let's wait a little bit. So they're agreeing over the course of those conversations to wait because they think that Lucas will come clean because he's scared and weak and he'll eventually realize that he needs to pay up, and then they won't have to resort to these extortionate means. So the government submits that that evidence, those conversations, manifest Matarati's intent or agreement to defer that payment. So just so I get the government's theory, on this theory, the moment Matarati disbelieves the story being told to him by Lucas, every moment that passes from the moment of that disbelief until the assault should be understood as a tacit agreement to defer payment? The government would submit yes because otherwise Matarati could have... And how long a period is that? I believe Lucas returned on March 29th. I believe the first conversation with Matarati was March 30th. When's the first time he manifested disbelief, a clear disbelief? The conversation on March 30th where he says, I hope you're telling the truth. So if I didn't think that manifested clear disbelief, what would be the first moment in the government's view that it was clear that Matarati disbelieves him, and even though he disbelieves him, is then giving time before he takes action? The following day, which would be March 31st, Matarati goes to Lucas's house. He stands in his driveway on the cell phone and calls Lucas. Lucas says, I'm not home, but actually he was, according to Lucas's own testimony. And Matarati says, I don't believe you got robbed. Give me my stuff. And Lucas says, I don't know what you're talking about. So the period from March 31st to April 9th is the extension of credit? The government argued the 30th, but at least from the 31st to April 9th. And that, you think, follows right from Hoyle in which there was an electrician who comes and doesn't make a bill at the time he provides the services and then six months later does something about it. Yes. The case law from outside the circuit doesn't suggest that. In fact, it suggests that even a short deferral of payment, such as Bouloghanis from the Seventh Circuit, which found no extension of credit because the strong-armed men showed up and beat up the victim before they took the payment. Just so I get the limits of this. I understand the logic of it. If in the morning he says, give me the drugs. I don't believe you anymore. And Lucas says, I don't have them. And Madarati then says to his henchman, let's get them in the evening. Is that an extension of credit from the morning to the evening? Yes, the government would submit that it is. He's given him time. He's made clear that there's a claim that he demands payment on. He doesn't collect it immediately. There's a passage of time. And the Third Circuit's case, I believe it was Bruce, or it could have been Garcia. I apologize. There's a passage of a day or two, I believe. And the Third Circuit treated that as a loan in that drug deal situation, but said even if it wasn't a loan, there was clearly a claim. When you give someone money to buy drugs and you expect them to return it, there's a claim there. And the defendants waited at the house, left, came back the next night, and after that decided to beat up the person who owed the money. So that was a very short passage of time. And it was clear that they expected the money just as in oil. The customers did not expect to get the electrician's services for free. And when the electrician finally made the demand and they didn't pay the exorbitant fees, there was an extension of credit or a deferral of repayment terms involved there. So if the electrician shows up on Friday and doesn't submit the bill until Monday, that's an extension of credit? If he performs the services on Friday? Yeah. And submits the bill on Monday? I think the point there would be that when is he collecting and when is he making clear? He's made clear his demand by submitting the bill. And then, yes, if he does not collect immediately upon submitting the bill and establishing the claim, and I think that's where the factual analogy is most apt here. Because once we establish that Moderati has said, you need to give me the money or the drugs, Lucas understands that, and then there's a passage of time before the collection attempt is actually made. That establishes the extension of credit within the meaning of A-94. Turning to the defendant's argument about prejudice resulting from their joint trial, as the Court has already noted, the misjoinder claims, whether the initial joinder that Dysnikian argues or the retroactive misjoinder that Mr. Martinez argues, these claims were not presented directly to the District Court in a way that would allow the Court to evaluate the claims and determine whether, for example, initially Mr. Dysnikian should not have been tried with Mr. Martinez or whether, in retrospect, the Cristofori extortion having been directed out, Mr. Martinez should have been given a new trial or a separate trial on the Lucas extortion. And looking at it now on appeal with the benefit of the jury's verdict, the defendants cannot make the compelling showing of prejudice they need to establish reversible error. What effect does Judge Lobel's answer to the jury question have? First of all, are the objections to that fully preserved? No, it is not. And the record shows that Mr. Dysnikian did not object at all to the instruction. He made an offhand comment that he had never heard the question before, but he did not ask for a different instruction, or he did not ask for the Court to give a different answer, nor did he object when the instruction was given. And Mr. Martinez, when the Court indicated that it intended to say yes, Mr. Martinez lodged an objection that is different than the one he presents here. The one he presented at trial was that the Court, he requested that the Court give a 404B-type limiting instruction, not that the Court say something about not using the, sorry, that the Court give a 404B-type limiting instruction that the Cristofori extortion evidence be used for a limited purpose, not to prove substantive guilt, but to show those kind of purposes, those motive, intent, opportunity, knowledge, that it was relevant for as it related to the Lucas extortion. The government doesn't understand Mr. Martinez making that argument on appeal. What he's saying on appeal, like Mr. Dysnikian, is that the instruction given by the Court was wrong, and the government submitted it was not because the Court said earlier, made very clear that each, the jury must consider all the evidence as to each defendant in each charge. When the jury asked, can we use all the evidence presented during the trial as we evaluate each individual charge, the Court said yes. It's not a remarkable proposition given the earlier instructions, nor is it incorrect. And what was the follow-up clarification? The follow-up was, as after the judge explained the reasonable inference, the answer to the reasonable inference question the judge said before the jury left, and you understand the use of all the evidence with respect to each charge as it applies to that charge. And the government submits that this was entirely consistent with the earlier instructions given by the Court, which were quite clear, and repeatedly identified which charge applied to which defendant and what the elements were of each offense that needed to be reversed. What prompted the judge to give that additional clarification? Was there an objection from counsel, or she recognized herself that perhaps she had to modify what she had just said? There was no objection given there was no question by the jury, and perhaps that reason Your Honor gave is what the judge was thinking, but there's no evidence in the record really to give us an answer one way or another. I forget how the transcript works. Is it she answers yes, and then the next thing that happens is she then issues this qualification? No, there's an intervening discussion. The jury asked the questions. There were two. One was the jury requested a definition of a reasonable inference. That was question number one. And question number two was can we use all the evidence presented during trial as we evaluate each individual charge? Because the Court was simply answering yes to the second question, it answered that one first for the jury. Then it provided the definition of a reasonable inference, and then before the jury left, it added and you understand the use of all the evidence with respect to each charge as it applies to that charge. So in the government's view, this was entirely consistent with the earlier instructions, which were sufficient to focus the jury's attention on the evidence properly as to each charge that was levied against the defendants. And for that reason, we would argue that the defendants cannot make the compelling showing of prejudice in this case to justify a new trial. If there are no further questions, I'm going to rest on his grace. Thank you.